STATE OF VERMONT

SUPERIOR COURT                                        ENVIRONMENTAL DIVISION

| In re: Lee NOV Appeal<br><br>********************************************** | No. 17-3-15 Vtec<br><br>****************************************** |
| --- | --- |
| Town of New Haven v. Lee | No. 61-5-15 Vtec |

**DECISION ON THE MERITS**

In 1995, Michael Lee purchased an already-developed commercial property on U.S. Route 7 in the Town of New Haven after the prior business owner had died and his mortgage holder had foreclosed on the property. Over the following years, Mr. Lee created and expanded his business on this property into what is now known as "New Haven Power Equipment."

Over his years of ownership, Mr. Lee had large amounts of earthen fill brought onto his property. Much of the fill was delivered to the property without benefit of a zoning permit. He also created an elevated display area near the highway in front of his property, brought up to twenty-four storage trailers onto his property, and expanded its parking lot. Most of this work too was done without the benefit of a zoning permit.

After discussions that continued over many months, the Town of New Haven Zoning Administrator ("Zoning Administrator") served Mr. Hill with a notice of alleged zoning violations, which Mr. Hill timely appealed to the Town of New Haven Development Review Board ("DRB"). When the DRB decided to uphold the NOV issued to Mr. Hill, he filed a timely appeal with this Court. That appeal became the subject of Docket No. 17-3-15 Vtec.

The Town of New Haven also filed an action in this Court to enforce this notice of alleged zoning violations; that enforcement action became the subject of Docket No. 61-5-15 Vtec.

Mr. Lee is represented in these two coordinated proceedings by Attorney Ebenezer Punderson. Attorney Cindy Ellen Hill represents the Town.

The trial of these coordinated proceedings was completed in two days (May 3–4, 2016). After the trial, the parties were afforded an opportunity to file proposed Findings of Fact and

Conclusions of Law. Their post-trial filings were completed on June 20, 2016 and this matter was thereafter placed under advisement before the Court.

Prior to the trial, the Court conducted a site visit of the subject property. While the observations and statements made during the site visit were not received as evidence, the site visit provided helpful context for the evidence that was presented at trial.

Based upon the evidence presented, the Court renders the following Findings of Fact, Conclusions of Law, and the Judgment Order that accompanies this Merits Decision.

**Findings of Fact**

1. Michael Lee (hereinafter "Respondent" or "Mr. Lee") is the owner of a commercially-developed property at 3065 Ethan Allen Highway (a/k/a Vermont Route 7) ("the Subject Property" or "the Property") in the Town of New Haven, Vermont.

2. Respondent first acquired the Subject Property in 1995. At the time of his purchase, the Subject Property contained a large commercial building and parking area.

3. The Subject Property is located mostly in the Highway/Commercial Zoning District ("HC District") in the Town of New Haven ("Town"). A back corner of the lot is situated in the Industrial Zoning District. The Property also borders the Rural Agricultural Zoning District ("RA District"); Vermont Route 7forms the common boundary between the RA district and HC district.

4. The prior owner of the Property, a Mr. Thomas Dwyer, had used the Property to operate his office equipment retail store and salvage operation.

5. After Mr. Dwyer passed away, his estate lost title to the Property through a mortgage foreclosure. Respondent thereafter purchased the Property from the foreclosing party.

6. When Respondent purchased the Property, it already had some site improvements. The condition of the Property during Mr. Dwyer's ownership was accurately depicted at trial through testimony that referenced a photo admitted at trial as Respondent's Exhibit 1.

7. David J. Wetmore, who since December, 2010 has served as the Town of New Haven Zoning Administrator ("Zoning Administrator"), provided credible testimony at trial concerning the zoning permits issued to Respondent and his predecessor, Mr. Dwyer. His summary of those permits was admitted at trial as Exhibit A, pages 1 through 3.

8. Exhibit A represents the entirety of the Zoning Administrator's file concerning the Subject Property. The first three pages are a summary of the file contents prepared by the Zoning

Administrator, with the subsequent pages in Exhibit A marked with Bates Stamp numbers for each page. The Zoning Administrator's three-page index includes reference to the Bates Stamp pages for the indexed file items.

9.      At the time of Respondent's purchase of the Property, the rear of the lot contained varying slopes, including some steep slopes, behind the existing building that faced Route 7. There were no trailers stored or located on the Property at the time of his purchase. See Respondent's Ex. 1.

10.     At some unspecified period prior to when Respondent purchased the Subject Property, large amounts of top soil and other earthen materials may have been removed from the Property for use at other locations.

11.     Respondent began making improvements to the Property immediately after his purchase. On November 21, 1995, a prior Zoning Administrator issued a zoning permit that authorized Respondent to construct and use a large addition to the existing barn. Respondent represented that the proposed addition would be used for "storage and repair." Ex. A, Bates Stamp Page 9.

12.     On January 26, 2000, Respondent was issued another zoning permit that authorized him to construct and use another addition to the southwest section of his barn for a "parts room." See Ex. A, Bates Stamp page 12.

13.     A separate zoning permit was issued to Respondent on April 19, 1999. This permit authorized Respondent and his agents to bring fill onto the Subject Property. See Ex. A, Bates Stamp page 11.

14.     On November 6, 2003, Respondent appeared before the Town of New Haven Planning Commission ("Planning Commission"), advising that he wished to expand his business to include the sale of small sheds to store lawn mowers, tools, and other equipment on the customers' own property. Respondent advised that he did not believe that this expansion or "change" in the business use of his property required another permit or approval, and the Planning Commission agreed, concluding that he did not need the Commission's approval for his planned business use expansion. See Ex. A, Bates Stamp page 15–16.

15.     Respondent did not receive and act upon any other permits or zoning authorizations concerning the Subject Property.

16.     During the time period that the permits itemized above were issued, the zoning regulations then in effect provided that "all activities authorized by [a permit's] issuance shall be completed within two years of its date of issue, or the Zoning Permit shall become null and void and reapplication to complete any activities shall be required." Section 319 of the Town of New Haven Municipal Development Plan and Zoning Regulations, effective March 6, 1990 to June 27, 2006 ("1990 Zoning Regulations"), a copy of which was admitted at trial as Exhibit E.

17.     Thus, Respondent was entitled under his 1999 permit to bring clean fill onto his property during the time period spanning April 19, 1999 up to April 20, 2001.

18.     Respondent continued to bring fill onto his property after April 20, 2001. Town officials estimated that after that date, Respondent brought in excess of 10,000 cubic yards of fill per year onto his property during the ensuing twelve years. In fact, based upon other trial testimony, including testimony offered by Respondent, the actual total amount of fill brought onto Respondent's Property after his 1999 permit had expired (i.e., on and after April 20, 2001) likely exceeded 200,000 to 300,000 cubic yards.

19.     Some of the fill has settled, become stabilized, and is now overgrown with grass and other vegetation. The slope of the fill material is uneven in many places, including in places where the slope exceeds a 1:2 (vertical to horizontal span) ratio. Steep slopes can become unstable, particularly during heavy rains and stormwater runoff.

20.     Particularly along Respondent's southerly boundary line, the fill placed on the Property slopes steeply towards the neighboring property, causing runoff from heavy rains and stormwater runoff. The slope in this area greatly exceeds a 1:2 ratio.

21.     Respondent's predecessor would often display items for sale on the front lawn of the Property, near Vermont Route 7. Respondent continued this practice, albeit with his power equipment, from the beginning of his ownership of the Property.

22.     Sometime between 2009 and 2011, Respondent built this display area up with fill and gravel, thereby elevating the display area. Respondent has used this elevated area to display items for sale at his New Haven Equipment business. Compare Ex. A, Bates Stamp pages 104 through 106.

23.     This fill increased the height of the elevated display area by about three and one half feet. The earthen fill and gravel on the display area has not been stabilized with seed or mulch; it continues to consist of an exposed area of gravel.

24.     All the fill that Respondent placed on the front display area is within the applicable front yard setback from the center line of the Route 7 highway.

25.     In an effort to cure various zoning violations alleged by the Zoning Administrator, Respondent filed a new site plan approval application in 2014. A copy of the 2014 site plan, prepared by Jason Barnard Consulting, LLC, was admitted at trial as Exhibit H. That site plan depicts an elevated display area. However, Respondent later withdrew that site plan application when the Planning Commission informed him that it could not approve his site plan, since it depicted an elevated display area within the front yard setback from Vermont Route 7.

26.     Respondent never sought or obtained a zoning permit for placing the fill material on his property that elevated this front display area.

27.     Sometime in 2010, Respondent caused his parking area to be enlarged, expanded and realigned. Some of the gravel and fill that he scraped from the existing parking lot was used to elevate the front yard display area. He failed to apply for or receive a zoning permit authorizing any of this work.

28.     Respondent's parking lot work was in response to the drainage problems on the existing parking area, which sloped towards his building. He also expanded and realigned the parking area after installing cement bases for light poles he wished to install. Respondent installed the cement bases, but not the light poles. He did not apply for or receive a zoning permit for this work, either.

29.     Sometime on or after the year 2000, Respondent began to bring box trailers[1] onto his Property, principally to use as storage structures for power equipment and other materials from his business. He did not receive a zoning permit authorizing the use of these box trailers for storage on the Subject Property.

---

[1] We use the term box trailers here to denote the large, approximately forty-foot long trailers that are often connected to large tractor trucks, so that they may be transported on highways. None of the box trailers located on Respondent's Property are connected to tractor trucks, except for when they were brought onto Respondent's Property or relocated within the Property.

30.     On November 19, 2006, respondent received site plan approval for the construction of two additional warehouses on his Property. The site plan approval included three conditions requiring that: (1) all necessary state permits be approved; (2) outside lighting be in conformance with Regulations § 440;[2] and (3) landscape screening be planted by a certain date, and to certain specifications. See Ex.t A, Bates Stamp page 22.

31.     At the time of Respondent's 2006 application, his site plan <u>did not</u> include any depiction of the storage trailers, the elevated display area, or the enlarged parking area.

32.     Although Respondent began certain site preparation work, he never constructed the two proposed warehouses on his Property that were authorized by the 2006 site plan approval.

33.     By July 2003, Respondent had as many as nine box trailers on his Property that were being used for business storage purposes. See Google Earth shot, admitted at trial as Ex. A, Bates Stamp pages 93–95.

34.     Through the following years, Respondent brought additional box trailers onto his Property to use for storage. For example, by 2006, Respondent had installed as many as eleven box trailers for storage use, as evidenced by trial testimony and a Google Earth shot, admitted at trial as Exhibit A, Bates Stamp page 99.

35.     By 2008, the number of box trailers being used for storage on Respondent's Property had increased to eighteen. See Google Earth shot, admitted at trial as Ex. A, Bates Stamp pages 93–95.

36.     By 2012, Respondent had a total of twenty-four box trailers located on his property and being used for storage of business supplies. See Google Earth shot, admitted at trial as Ex. A, Bates Stamp pages 108.

37.     An aerial photo of Respondent's Property, taken in 2013, was admitted at trial as Exhibit 8. This photo accurately depicts the enlargement of Respondent's parking area, the status of the fill and uneven slopes to the soils, and the elevated and improved display area on the front of this property.

---

[2] At the time of Respondent's 2006 site plan application, the zoning regulations had been amended; a copy of the zoning regulations then in effect, running from June 27, 2006 through May 29, 2007 ("2006 Regulations") was admitted at trial as Exhibit D. A copy of the zoning regulations subsequently amended, effective from May 29, 2007 through August 21, 2012 ("2007 Regulations") was admitted at trial as Exhibit C.

38. Respondent has secured some of the box trailers to the ground by mounding dirt around them, including in the rear of the trailers, so that the ground is roughly level with the trailers' loading doors. Most of the trailers are surrounded by dirt or disabled in such a way as to not be road-worthy or readily moved.

39. At no time during his ownership of the Property has Respondent applied for or received a zoning permit or other approval that authorizes him to permanently locate the box trailers on his Property or to use them for business storage.

40. Respondent has amassed a large collection of used lawn mowers, lawn tractors, and other power equipment, much of which is in varying states of disrepair. Most of this used equipment is stored inside the box trailers on the Subject Property. However, there is a considerable number of used parts, pieces of power equipment, and items of little discernable value stored outside in several locations along or near the main barn and various trailers. Much of these materials that are stored outside are unprotected from the elements and are not operable.

41. Respondent has not applied for or received a zoning permit that authorizes him to operate a junk yard or to store used power equipment and parts outside or within the views from roadways and neighboring properties.

42. The Zoning Administrator initiated several communications and conversations with Respondent, all in an effort to convince Respondent that there were zoning violations on his Property, and to assist him in curing those violations.

43. On January 27, 2011, the Zoning Administrator wrote to Mr. Lee as a follow up to conversations they previously had concerning the alleged zoning violations on the Subject Property; a copy of that letter was admitted at trial as Exhibit A, Bates Stamp pages 37–39. By this letter, the Zoning Administrator identified his concerns about Mr. Lee's continuing placement of fill on his property without the benefit of site plan approval or a zoning permit, both in the rear of the Subject Property and to elevate the display area in the front of the Property.

44. Following some further discussions, the Zoning Administrator again wrote to Mr. Lee on February 24, 2011. A copy of this correspondence was admitted at trial as Exhibit A, Bates Stamp pages 40–49. By this correspondence, the Zoning Administrator confirmed his assessment that the then-existing zoning regulations, the 2007 Regulations, as well as the applicable prior

regulations, required that an improved commercial display area in Respondent's front yard area must respect a 200-foot setback from Vermont Route 7.

45.     The Zoning Administrator's efforts at convincing Mr. Lee to cure the alleged zoning violations did not prove successful.  The Administrator attempted one further effort by sending an additional letter to Mr. Lee, which the Administrator described as a "cease and desist letter," dated July 30, 2013.[3]  A copy of this letter was admitted at trial as Exhibit A, Bates Stamp pages 72–76.  In this letter, the Administrator provided an historical summary of the permits applied for and received concerning the Property (both by Respondent and his predecessor, Mr. Dwyer), and a summary of the land development that the Administrator believed Respondent had caused on his Property that constituted zoning violations.

46.     At Respondent's request, the Zoning Administrator thereafter sought advice from the Planning Commission on an interpretation of the current zoning regulations[4] as they pertained to front yard setback in the HC District.  The Planning Commission discussed the applicability of exterior display areas and the required front yard setback at their October 9, 2013 meeting; that discussion concluded with the Planning Commission advising that it concurred with the Zoning Administrator's interpretation of the 2012 Regulations and his determination that Mr. Lee's development and use constituted a zoning violation.

47.     On November 5, 2013, the Zoning Administrator issued a "Notice of [Alleged] Zoning Violation" ("2013 NOV") to Mr. Lee.  Mr. Lee was served by certified mail, return receipt, on November 20, 2013.  See Ex. A, Bates Stamp pages 84–88.  In the 2013 NOV, the Zoning Administrator identified the following alleged zoning violations, listed collectively under the heading "Violation #1: Article II, section 240 – Application of Regulations":

1. Excessive amounts of fill have been placed on your property, greatly exceeding 50 cubic yards, pursuant to [2012 Regulations] section 525.

2. The slope along your southern boundary exceeds the one-to-two ratio permitted pursuant to section 560.

3. Constructed an elevated equipment display area within the front yard setback.

---

[3]  The Zoning Administrator credibly testified at trial that he always first tries to resolve alleged zoning violations with the property owner, and always sends a "cease and desist letter" prior to issuing a notice of violation.

[4]  The then-existing zoning regulations came into effect on August 21, 2012 and remained in effect through the date of trial.  A copy of those regulations were admitted at trial as Exhibit B ("2012 Regulations.").

4. Changed your parking area.

5. Use of a portion of the property for a junkyard.

6. The storage/use of 20+ trailers on the property.[5]

48. In addition to the six alleged zoning violations listed under "Violation #1", the 2013 NOV also alleged two further general zoning violations:

"Violation #2: Article III, section 312 – Zoning Permit" alleges that the listed activities constituted "land development" that required a zoning permit and that Respondent had failed to apply for or receive the necessary permit; and

"Violation #3: Article III, section 250 – Site Plan Approval" alleges that Respondent's commercial use of the lands that he improved on his Property required site plan approval under 2012 Regulations § 350 and Article 10, and that he had neither applied for nor received that approval.[6]

49. A lot of fill was brought onto Respondent's Property in 2013; the Zoning Administrator credibly estimated that the fill brought onto the Property in 2013 alone could have totaled 30,000 cubic yards. However, Respondent ceased bringing more fill onto his property once he was served with the 2013 NOV.

50. Respondent timely appealed the 2013 NOV to the DRB. The first hearing on Respondent's appeal was held on January 20, 2014, with an additional seven adjournments through the following year; the final DRB hearing on Respondent's appeal was held on January 5, 2015. The DRB then issued a written decision dated February 11, 2015, upholding all the zoning violations included in the 2013 NOV, with the exception of Violation #1, subsection 5; the DRB determined that Respondent's activities did not constitute a junkyard.

51. Respondent thereafter filed a timely appeal of the adverse DRB determinations to this Court.

52. To date, Respondent has not filed applications for zoning permits or site plan approval for the land development he commenced on his Property from 2003 to the present.

---

[5] Exhibit A, Bates Stamp page 84.

[6] Within Article 10 of the 2012 Regulations, § 1005 governs the HC District. In particular, § 1005(C) provides that "[s]ite plan approval as described in Sections 350, 351 and 352 of these regulations shall be required for all uses in the HC District, except for one-family and two-family dwellings."

53.     As of the date of trial, Respondent has not removed the fill or storage trailers that he previously brought onto his Property.

**Conclusions of Law**

These two coordinated proceedings present overlapping factual and legal issues for the Court's consideration.  Because the Town's enforcement proceeding is dependent upon the viability of the 2013 NOV, we first address the legal issues raised in Respondent's NOV appeal.[7]

**I.     NOV Appeal (Docket No. 17-3-15 Vtec)**

In his NOV appeal, Mr. Lee presents legal issues in a thirteen-point Statement of Questions, each of which challenge the legality of one or more of the zoning violations alleged in the 2013 NOV.  Therefore, we address the alleged zoning violations in the order in which they are presented in the 2013 NOV and note each of the legal issues from Respondent's Statement of Questions that are resolved by the subsections below.

*a.) Zoning Violation #1:  Development in Violation of 2012 Regulations § 240.*

*1.  Excessive fill brought on to property.*

The credible evidence, mostly undisputed, is that Respondent began bringing fill onto his Property a short time after he purchased it in 1995.  In fact, the undisputed evidence was that he began bringing fill onto his Property even before he received a permit in 1999 that authorized him to bring in the fill.  While those pre-permit activities may have constituted zoning violations, the 2013 NOV does not charge him with that transgression.

Rather, the parties' dispute comes into focus on a decisive legal point:  whether Respondent's 1999 zoning permit authorized him to receive and disburse fill on his Property after that 1999 permit expired.  For the reasons stated below, we answer that legal question in the negative.

Under the then-existing zoning regulations, the 1990 Regulations, the land development authorized by a zoning permit "shall be completed within two years of [the permit's] date of issue, or the Zoning Permit shall become null and void and reapplication to complete any

---

[7] Since the Town did not file a cross appeal to challenge the DRB's decision to not uphold the allegation in the 2013 NOV that Respondent was operating a junkyard on his property, that determination is final and we do not review it here.  See 24 V.S.A § 4472(d).

activities shall be required." 1990 Regulations § 319. Since the definition of "land development" in the then-existing Regulations included "the construction, reconstruction, conversion, structural alteration, relocation or enlargement of any building or other structure, or of any mining, excavation or land-fill, and any change in the use of any . . . land,"[8] we conclude that the actions taken by Respondent to bring fill onto his Property to even out the side and rear portion of his land was "land development" under the 1990 Regulations.

In fact, the definitions for "development" and "land development" in all subsequent zoning regulations contained near identical explanations for the phrases. Compare 2006 Regulations § 130; 2007 Regulations § 130; and 2012 Regulations § 130. Thus, we conclude that Respondent's activities for bringing fill onto his Property and distributing it there for the nearly twelve years between the time his 1999 Permit expired and the 2013 NOV was issued constituted repeated zoning violations, since he had neither a zoning permit nor site plan approval authorizing his commercial development activities during that time period.

In Question 1 of his Statement of Questions, Respondent asserts that "the doctrine of equitable estoppel bar[s] the Town" from prosecuting Mr. Lee, since he was advised "by zoning officials that he did not have to renew his 1999 permit allowing him to 'fill [the] back [of the] lot to level.'" Appellant's Statement of Questions, filed March 30, 2015, at 1. For the reasons detailed below, we decline to adopt the rationale from Respondent's Question 1.

"The doctrine of equitable estoppel precludes a party from asserting rights which otherwise may have existed as against another party who has in good faith changed his position in reliance upon earlier representations." My Sister's Place v. City of Burlington, 139 Vt. 602, 609 (1981). The doctrine of equitable estoppel obligates the party seeking relief under the doctrine to satisfy four elements of proof: (1) the party to be estopped must know the true facts; (2) the party to be estopped must intend that his conduct shall be acted upon by the party seeking estoppel; (3) the party asserting estoppel must be ignorant of the true facts; and (4) the party asserting estoppel must rely to his detriment on the estopped party's representations. In re Lyon, 2005 VT 63, ¶ 17, 178 Vt. 232 (citing Wesco, Inc. v. City of Montpelier, 169 Vt. 520, 524 (1999)). In addition, when, such as in this case, a party is seeking the relief afforded under the doctrine of

---

[8] 1990 Regulations § 130.

equitable estoppel against a governmental entity, they assume the duty to prove a fifth element: that the "injustice that would result from denying the estoppel outweighs the negative impact on public policy that would result from applying estoppel." In re Griffin, 2006 VT 75, ¶ 18, 180 Vt. 589 (mem.) (citing Lakeside Equipment Corp. v. Town of Chester, 2004 VT 84, ¶ 8, 177 Vt. 619 (mem.)). Because of the heavy burden imposed by this fifth element, the Supreme Court in both Griffin and Lakeside opined that equitable estoppel claims against government entities are only applied in "rare instances." Id.

We decline to analyze these five elements in this case, however, because we find no credible evidence to support the basic premise upon which Respondent bases his equitable estoppel claim. At trial, Respondent presented no credible evidence that "zoning officials" from the Town assured Respondent that he could continue his fill activities after his permit expired. In fact, the Town called as a witness the former Zoning Administrator, now retired and living out of state. This gentleman offered no supportive testimony for Respondent's claim.[9] Respondent was evasive, at best, during his brief testimony on this point.

For these reasons, we conclude that Respondent has failed to present any credible evidence to support his claim of equitable estoppel. We therefore conclude that the credible facts presented support the claim outlined in the 2013 NOV that Respondent brought fill onto his Property, specifically during the period running from April 21, 2001 through November 5, 2013, all in violation of the then-existing zoning regulations. The total fill brought onto Respondent's Property during this time period exceeded several hundred thousand cubic yards. We therefore also conclude that this zoning violation was substantial.

### 2. *Fill slope exceeds the one-to-two ratio permitted pursuant to section 560.*

Respondent's Question 2 asks whether the earthen slopes near and at Respondent's southern boundary are steeper than the maximum slope steepness allowed by the zoning bylaws. We answer Question 2 in the affirmative.

---

[9] In fact, this former Zoning Administrator, a Mr. Christian Messerle, testified that Mr. Lee "often started projects before getting a permit." Mr. Messerle further advised that in regards to Mr. Lee's post-April 21, 2002 fill activities, he advised Mr. Lee "to stop the work and get a permit." Other trial testimony proved that Mr. Lee chose not to follow Mr. Messerle's advice.

Because the NOV was issued in 2013, we must determine whether the slope was in violation of the 2012 Regulations, which were in effect at that time. Pursuant to 2012 Regulations § 560, "[n]o grading, cutting, **or filling** shall be carried out in any district which leaves the slope in excess of one to two." (emphasis added).

We specifically find that the credible evidence shows that the slope of the embankment along the southern boundary of Mr. Lee's Property is in excess of the one-to-two ratio limitation in 2012 Regulations § 560. Mr. Lee for the most part did not contradict this evidence at trial. We further conclude that this slope is the result of Respondent bringing in excess of 200,000 cubic yards of fill onto his Property and depositing that fill in a haphazard manner, including at slopes on and near his southern boundary steeper than a one-to-two ratio. Because the slope is in excess of the one-to-two ratio, and because the slope was left in that state as the result of filling, we conclude that Respondent is in violation of 2012 Regulations § 560.

Respondent's Question 3 asks whether the excessively steep southern slope is a pre-existing, nonconforming use because the fill was placed there before the 2012 Regulations went into effect. We answer this question in the negative.

A nonconforming use is defined as a "use of land that does not conform to the present bylaws but did conform to all applicable laws, ordinances, and regulations prior to the enactment of the present bylaws, including a use improperly authorized as a result of error by the administrative officer." 24 V.S.A. § 4303(15); see also 2012 regulations § 130.

Here, the language in 2012 Regulations § 560 specifying slope requirements is identical to the language in §560 of the 1990 Regulations, 2006 Regulations, and 2007 Regulations. Because at all times during Mr. Lee's ownership of the Property the zoning regulations prohibited creating a slope in excess of the one-to-two ratio, such a slope never conformed to prior regulations, and therefore cannot be a nonconforming use. In addition, each set of regulations, at § 525, required a permit to bring more than 50 cubic yards of fill onto a property. Because Mr. Lee deposited over 200,000 cubic yards of fill on his property from 2002 through November 2013 without a permit to do so, his fill work during those years also cannot be regarded as a pre-existing, nonconforming use.

### 3. *Constructed an Elevated Equipment Display Area.*

The Town alleges that the display area violates the applicable regulations in two ways: (1) it is a land development for a commercial use that was constructed without first receiving site plan approval or a zoning permit; and (2) it is a land development located within the applicable front-yard setback.

The Town alleges that, sometime in 2010, Respondent improved the display area by increasing its height by approximately three and a half feet by placing a considerable volume of gravel and other earthen fill onto the display area. We find that the credible evidence presented at trial supports the finding that between 2009 and 2011 the display area was built up with earthen material, fill, and gravel, thereby elevating the display area.

In Question 4, Respondent asks whether his elevated display area "constitute[s] a 'structure' within the meaning of the Town's zoning bylaws." We do not regard this Question as germane to the legal issues presented by the 2013 NOV. None of the Town's allegations on this point are premised upon the elevated display area being defined as a "structure," which the applicable regulation defines as "[a]nything constructed, erected or placed on property, the use of which requires location on the ground, or attachment to something located on the ground." 2012 Regulations § 130. While we consider this definition clear and likely applicable to the elevated display area, we decline to answer Respondent's Question 4, since that Question is not germane to the legal issues presented by the 2013 NOV.

By his Question 5, Respondent asks whether "the creation of the elevated display area [constitutes] 'land development' as defined in the Town zoning bylaws?" As discussed above, we conclude that the elevated display area is "land development" as defined in the applicable zoning regulations. See § 130 of 2007 and 2012 Regulations (defining "land development" as, among other things, "excavation or land-fill, and any change in the use of any building or other structure or land, or extension of use of land"). Because the improvement of the elevated display area is "land development," we answer Respondent's Question 5 in the affirmative.

We also conclude that the elevated display area is a "land development" that was done without site plan approval or a zoning permit. The display area therefore violates § 312 of the 2007 and 2012 Regulations (requiring a permit be obtained before a land development may commence), § 1005(C) of the 2007 and 2012 Regulations (requiring site plan approval for all uses

in the HC district) and § 240 of the 2007 and 2012 Regulations (requiring that all land developments conform with the Regulations).

The elevated display area was built between 2009 and 2011, when the 2007 Regulations were in effect. All relevant sections of the Regulations that lead us to conclude the display area violates those Regulations—§§ 130, 312, 1005(C), and 240—are the same in the 2007 and 2012 Regulations. The construction of the elevated display area was therefore in violation of the 2007 Regulations when it was built, and the 2012 Regulations when the NOV was issued. Because the elevated display area never complied with the applicable regulations, it does not predate Town zoning regulations and cannot be considered a pre-existing, nonconforming structure (or nonconforming use). We therefore answer Question 6 in the negative.

By his Question 7, Respondent asks whether "the elevated display area [has] been in existence for over 15 years such that the Town is estopped pursuant to 24 V.S.A. §4454(a) from bringing an enforcement action to remove the elevated display area?" Because the elevated display area was built between 2009 and 2011, it was not in existence for over 15 years prior to the 2013 NOV. We therefore also answer Question 7 in the negative.

For similar reasons, we answer Respondent's Question 8 in the affirmative: his continued display of equipment for sale within the front yard setback is a zoning violation, since he has chosen to do so on top of an elevated display area that he constructed without the necessary zoning approvals. The mere fact that he had previously displayed equipment on a non-elevated area in the previous years does not make his use of an unpermitted elevated display area any less a zoning violation.

We also agree that the location of the elevated display area in the setback area violates the 2012 Regulations. As explained in the Zoning Administrator's reply letter to Mr. Lee of September 12, 2013 (Exhibit A, Bates Stamp pages 79–80), the then-existing zoning regulations require that all land development respect the applicable front- and side-yard setbacks. 2012 Regulations § 540. In Respondent's case, his front yard setback is measured from the center line of Vermont Route 7 and covers the first 100 feet of his front yard. Id.; see also 2012 Regulations § 1005-A ("All **non-residential conditional uses** shall have a minimum 100-foot setback from the Rural Agricultural districts sections 1001, 1002, and 1003.") (Emphasis in original). Respondent's commercial uses of his property are permitted as a conditional use, subject to Planning

Commission approval. 2012 Regulations § 1005(B)(4). Given that Respondent's elevated display area is within 100 feet of the center line of Vermont Route 7, which was identified at trial as the common boundary between the HC and RA Zoning Districts, we conclude that Respondent constructed his elevated display area in violation of 2012 Regulations § 240 ("no land development shall occur unless in conformity with the regulations herein specified for the district in which it is located.").

4. *Changes to Parking Area.*

Mr. Lee does not dispute that he regraded and expanded his parking lot over the last twelve years. In fact, he offered explanations during his trial testimony for why he did this work, explaining that his parking lot was often wet and sloping slightly towards his building. While this explanation is understandable, he has failed to explain why he completed this work without first applying for and receiving the zoning permit and site plan approval required under the applicable zoning regulations.

Whenever a property owner conducts "land development" on Town property, he must conform with the applicable zoning regulations. See § 240 from the 1990, 2006, 2007, and 2012 Regulations. The definition for land development, detailed above, has remained constant in the various zoning regulations in effect for the entirety of Mr. Lee's ownership of the Subject Property. That definition requires that "reconstruction" or "alteration" on land must be preceded by a zoning permit; in the case of Mr. Lee's commercial uses of his Property, he must also apply for and obtain site plan approval.

Mr. Lee is well aware of these zoning requirements, as he has submitted site plan and zoning applications several times in the more than 20 years he has owned the Subject Property. But his trial testimony revealed that he has repeatedly conducted improvements on his property without first seeking the necessary zoning approvals. As the former Zoning Administrator credibly explained at trial, Mr. Lee has a habit of "starting projects without a permit." In listening to his trial testimony, the undersigned became convinced that Mr. Lee has an ability to convince himself that the land use regulations simply don't apply to him.

Because of his failure to detail his reconstruction and alterations to his parking area in a site plan submitted to the Town, there is no clarity about the parking lot improvements that he has completed. We do know, through his own testimony, that he took some of the gravel and

fill scraped from his parking lot and used it to construct his elevated display area on the front yard. We also know, again from his own admissions, that he expanded his parking area and added concrete bases and wiring for light poles for his parking area. But he has failed and refused to provide the details on these parking lot improvements in a site plan application.

By his Question 9, Respondent asks whether his driveway expansion was "implicitly approved by the Town as part of the November 2, 2006 site plan review and approval?" Appellant's Statement of Questions, filed March 30, 2015, at 1. That site plan application and the Planning Commission's decision concerning it were admitted into evidence at trial as Exhibit A, Bates Stamp pages 19–33. By this application, Mr. Lee sought authority to construct and use two commercial warehouses on his property. Id. The Planning Commission approved his site plan application, with conditions. Id.

While the hand-drawn site sketch by Mr. Lee identifies the general area of the parking lot, there is no reference to the parking lot improvements already made and no specifics provided of the improved parking lot's dimensions or the work performed. The Planning Commission minutes do not reflect any explanation, nor even a reference made to the parking lot improvements during Mr. Lee's presentation, nor is there any reference to the improved parking lot by Planning Commission members in the minutes or the resulting decision.

During trial, Mr. Lee offered no explanation as to why this Court should conclude that the Planning Commission in 2006 had "implicitly approved" his parking area improvements; he only explained why he did the "improvements." He offered no authority from the zoning regulations, state statutes, or case law precedent that would support his legal claim of implicit approval, and we choose not to create such legal authority from the scant facts presented. For this reason, we conclude that we must answer Respondent's Question 9 in the negative.

   5. *Junk Yard Claim.*

As noted above, the DRB decided not to affirm the Zoning Administrator's determination that Mr. Lee was maintaining a junk yard on his property. The Town chose not to appeal this adverse determination, thereby causing the DRB's rejection of this claim to become final. 24

V.S.A. § 4472(d).  We therefore conclude that this issue has not been preserved for our review in this appeal and choose not to address it.  V.R.E.C.P. 5(f).

6.  *Storage and Use of More than Twenty Trailers.*

Mr. Lee has brought an ever increasing number of box trailers onto the Subject Property, beginning when he first bought the Property over 20 years ago.  We decline to enforce a claim that trailers brought onto his property more than fifteen years ago may be prosecuted by the Town through the 2013 NOV, given the statutory prohibition against a Vermont municipality prosecuting a zoning violation "instituted [more than] 15 years from the date that the alleged violation first occurred . . .."  24 V.S.A. § 4454(a).  Based upon this statutory directive, we will only address the trailers brought to Respondent's property after November 5, 1998 (i.e., 15 years prior to the issuance of the 2013 NOV).

The best evidence of the number of trailers Respondent had on his Property after that date was the testimony and photo showing that in July, 2003, Respondent had up to nine box trailers on his Property, all of which Respondent testified were being used for business storage purposes.  See Google Earth shots, admitted at trial as Ex. A, Bates Stamp pages 93–95.  By 2012, Respondent had a total of twenty-four box trailers located on his property and being used for storage of business supplies.  See Google Earth shot, admitted at trial as Ex. A, Bates Stamp pages 108.  This demonstrates that between 2003 and 2012, Respondent moved 15 additional storage trailers onto the Property.

Respondent admits that he has never applied for or received a zoning permit authorizing him to bring box trailers onto his property to use for storage.  Rather, Respondent challenges the notion that he needs a permit for this commercial activity and use.

All the trailers on Respondent's property are being used for storage of equipment, parts, and other supplies used or sold in his commercial business.  Respondent has secured many of the trailers to the Subject Property with dirt along some sides and up towards the rear loading areas on the trailers.  Most, if not all, of the trailers are not road-worthy or capable of being moved.  As such, these storage trailers have become affixed to the land and are used solely for Respondent's business purposes.

Respondent's challenge to this item of the Town's allegations of zoning violations is premised upon whether the trailers on his property, as used, should be considered as

"structures." This classification has import to our analysis because a zoning permit is required under all regulations in effect during Mr. Lee's ownership when any "structure" is located, relocated or converted on a property for use. See § 130 of the 1990, 2006, 2007, and 2012 Regulations (defining "land development"). When land development occurs on property, a zoning permit is required. Section 312 of the 2006, 2007, and 2012 Regulations; see also 1990 Regulations § 319.

The credible evidence leads us to conclude that the box trailers brought onto the Subject Property since 2003 are structures, as that term is defined in all applicable zoning regulations. The manner in which Respondent has brought them onto the Property, secured them to the land, and devoted them to commercial storage uses constitutes land development for which a zoning permit is required. Because Respondent has chosen to not apply for or receive a permit for the fifteen trailers that have been added to his Property since 2003, we conclude that he is in violation of 2012 Regulations § 240.

In addressing Respondent's Question 10, we note that our conclusions here do not rely upon the trailers that Respondent brought onto his property prior to 2003. Therefore, our legal conclusion that these actions represent a zoning violation does not violate the 15-year prohibition of 24 V.S.A. § 4454(a). The Zoning Administrator made valiant efforts over many months and years to convince Respondent to bring his use of the storage trailers into compliance by seeking a zoning permit and site plan approval. Ultimately, Respondent declined to follow the Zoning Administrator's recommendations. Respondent provided no credible factual basis for the Town being equitably estopped from seeking compliance concerning the storage trailers brought onto the Property since 2003. We therefore answer Respondent's Question 10 in the negative.

For the same reasons detailed in our analysis of Respondent's claim that his parking lot improvements were "implicitly approved" by the Planning Commission during its 2006 review of his site plan application, we find no factual basis for concluding that the Planning Commission at that time "implicitly approved" his placement and use of the storage trailers. First, we note that in 2006, only two of the fifteen storage trailers that Respondent had added by 2013 were on the Property. See Google Screen shot admitted as Ex. A, Bates Stamp pages 96–99. There was no testimony offered that Respondent notified the Planning Commission in 2006 that he intended to bring even more trailers onto his Property without zoning approval. For all these reasons, we

conclude that there is no factual basis for concluding that Mr. Lee's parking lot improvements were "implicitly approved" by the Planning Commission in 2006. We therefore answer Respondent's Question 11 in the negative.

As detailed above, the fifteen storage trailers that Respondent brought onto and used on his Property since 2003 cannot be classified as lawful, pre-existing, non-conforming structures or uses, as their placement and use on the Property was never done in conformance with the then-existing zoning regulations. We therefore answer Respondent's Question 12 in the negative as well.

*b.) Zoning Violation #2: Failing to Obtain Necessary Zoning Permits*

The Town asserts, in the second section of its 2013 NOV, that the land development activities specified in items 1–4 and 6, above, constitute "land development" for which a zoning permit is required under 2012 Regulations § 312. As we have detailed above, all of the Town's allegations against Respondent (save for the junk yard allegation rejected by the DRB) fit the definition for "land development" under all versions of the zoning regulations in effect during Respondent's ownership of the Subject Property. Since all versions of the zoning regulations contained a provision that prohibited "land development" without a zoning permit,[10] we conclude that Respondent is required to apply for and obtain a zoning permit for all his fill activities, the elevated display area, the fifteen additional storage trailers, and the improved parking area, and comply with all conditions of any zoning permits that may issue. If Respondent fails to obtain the applicable zoning permits and comply with any conditions, then the only other manner in which he can cure his zoning violations is to remove the unpermitted land developments from his property. For these reasons, we conclude that Respondent has violated 2012 Regulations § 312.

*c.) Zoning Violation #3: Failing to Obtain Necessary Site Plan Approval*

All applicable zoning regulations required site plan approval for commercial uses such as Respondent's in the HC District. See §§ 350 and 1005(B)(4) in the 1990 Regulations, the 2006 Regulations, the 2007 Regulations, and the 2012 Regulations. Section 1005(B)(4) authorizes the use of HC District property for "farm implement and contractor's equipment sales and service,"

---

[10] See § 312 of the 2006, 2007, and 2012 Regulations; see also 1990 Regulations § 319.

which we conclude best fits the activities and uses that Respondent has conducted on his property. But such development and use in the HC District must receive conditional use approval. Id. And when activities and uses are regarded as conditional uses, all such activities and uses must also receive site plan approval, per § 350.

The circumstances presented by Respondent and his activities on the Subject Property likely provide a clear rationale for why the Town, through its zoning regulations, has required site plan approval: without a full and complete site plan, and review by the Planning Commission, there has been no clear explanation of what activities and uses are occurring on Respondent's property. More to the point of this remaining legal question, all applicable regulations require that such uses first receive site plan approval. The fact that Respondent has failed and refused to obtain site plan approval for the development and uses on his property over the up to fifteen years prior to the 2013 NOV leads us to conclude that he has committed multiple violations of 2012 Regulation § 350.

Respondent's remaining Question, Question 13, asks whether "site plan [approval is] required for pre-existing, non-conforming uses or structures?" Appellant's Statement of Questions, filed March 30, 2015, at 2. We can provide a generic answer to this generic question: we know of no requirement that a nonconforming use or structure obtain site plan approval. But we continue our analysis here to provide some applicability to the facts presented at trial.

To begin our analysis, we look to the applicable zoning regulations for a definition of nonconforming structures and uses. All applicable regulations have an identical definition for the terms: a nonconforming or non-complying use or structure is one that does not conform to all of the existing zoning regulations, but did once "compl[y] with all applicable laws, ordinances, and regulations prior to the enactment of these regulations . . .." 2012 Regulations § 130; see also § 130 of the 1990 Regulations, the 2006 Regulations, and the 2007 Regulations. Stated differently, to be regarded as a nonconforming use or structure, that use or structure must have at one time previously conformed with a prior version of the applicable regulations, or pre-dated the enactment of zoning in that municipality. Conversely, if the use or structure was never in compliance, it cannot be regarded as a lawful non-conformity.

This analysis provides our response to Respondent's final Question. There was no evidence presented that Respondent's box trailers or his use of them on the Subject Property

-21-

was ever in compliance with the various zoning regulations in effect throughout his ownership of the Subject Property. For this reason, we conclude that his box trailers, which are properly defined as structures, and their use on the Subject Property, cannot be regarded as non-conforming uses or structures. While we answer the generic interpretation of Respondent's Question 13 in the negative, we also note that as applied to his box trailers and uses of them, they do not fit within the defined terms "non-complying uses" or "non-complying structures."

For all these reasons, we hereby **AFFIRM** the DRB's decision to uphold all provisions of the 2013 NOV, save for the allegation that Respondent was operating a junk yard on the Subject Property. We therefore now turn to the remaining legal issues raised by the Town's zoning enforcement action against Mr. Lee.

## II.    Zoning Enforcement Action (Docket No. 61-5-15 Vtec)

By its zoning enforcement action, the Town seeks to enforce its 2013 NOV and to have this Court impose injunctive relief and penalties in response to Mr. Lee's zoning violations. Since we have determined that the 2013 NOV must be upheld (as revised by the DRB), we now turn to our analysis of the appropriate remedies.

Many zoning violators resolve their disputes with the prosecuting town prior to a scheduled trial. Even those that do not will often take remedial measures, at least when they concede that some of the Town's claims have merit. Respondent presented sincere explanations for why his activities and uses did not constitute the zoning violations claimed by the Town. Because of his belief, Respondent took little or no substantive remedial measures prior to trial. For those reasons, and because of the overwhelming evidence that supports the Town's claims, we conclude that we must direct that Respondent take specific remedial measures, within specific deadlines, and provide incentives for Respondent to complete this work and impose penalties if he chooses not to complete all remedial work.

### 1.) *Injunctive Relief*

First and foremost, Respondent must regrade, seed and mulch all slopes on his Property so that they do not violate the mandate of 2012 Regulations § 560: that fill and grading not cause slopes "in excess of one [unit vertical] to two [units horizontal]." This work is especially needed along the southern boundary of Respondent's property, given that the land currently slopes

severely towards his neighbor's property. Because of the potential for damaging effects of stormwater and erosion caused by these steep slopes, we direct that Respondent complete this regrading work **no later than Monday, January 16, 2017**.

Respondent must also prepare complete applications for conditional use and site plan approvals and, if successful with those applications, zoning permits. Since Respondent has submitted hand-drawn and unclear site plans in the past, we direct that he retain a Vermont-licensed engineer to complete the necessary application and site plans, and continue to employ that engineer to assist in his presentations to the Planning Commission and DRB. These applications and the site plan must provide detailed measurements and locations for all the land development activities determined by this Court. We direct that Respondent file with the Town the detailed site plan and complete applications for conditional use and site plan approval, and a zoning permit **no later than Friday, February 17, 2017**.

We place the burden upon Respondent to convince the Planning Commission and DRB to issue the needed conditional use and site plan approvals, as well as zoning permit or permits **no later than Monday, May 15, 2017**. If Respondent has not received approvals and permits by that deadline, then he must remove the elevated display area, the offending fifteen trailers and the parking lot improvements from the Property **no later than Friday, July 14, 2017**.

The Town has wisely advised that directing Respondent to remove the illegally-added fill from his Property may cause more environmental harm. We therefore decline to direct such removal. However, if Respondent does not complete the necessary slope grading work by the above deadline, and does not secure the necessary approvals (or remove the fifteen trailers, elevated display area, and parking lot improvements) by the above deadline, then we direct that Respondent remove all fill that has been deposited on his property since November 5, 1998 (i.e.: no more than fifteen years from the issuance of the 2013 NOV) **no later than Friday, July 14, 2017**.

Lastly, we direct that Respondent bring no more trailers or fill on to his Property, nor conduct any further land development or changes of the uses on his Property, without first obtaining all necessary Town and State land use approvals and permits, and that he **immediately remove** all equipment, parts, and other items from outside storage.

*2.) Appropriate Penalties*

This Court is also authorized to impose penalties of up to $200.00, per day, for each zoning violation. During and after trial, the Town advocated for the imposition of the maximum penalty against Respondent, which the Town calculates at over $200,000.00. While we recognize that imposing the maximum fine may be within our discretion, we believe the facts of these cases warrant a significant, but lesser penalty. We believe that a maximum penalty should be reserved for the most egregious zoning violation that causes the most risk or actual harm to the general public. In re Huntington NOV Appeal and Town of Bradford v. Huntington, Nos. 204-8-06 Vtec and 209-9-06 Vtec, slip op. at 8 (Vt. Envtl. Ct. Mar. 18, 2008) (Durkin, J.). While Respondent's disregard for the applicable zoning regulations is multi-layered and long-standing, we decline to impose the maximum penalty.

When considering the appropriate level of penalties, we look to the guidance provided by our Supreme Court. In re Beliveau NOV, 2013 VT 41, 194 Vt. 1. Our goal in imposing the appropriate penalty for the zoning violations here is "to balance [the] continuing violation[s] against the cost of compliance and to consider other relevant factors, including those specified in the Uniform Environmental Enforcement Act [10 V.S.A §§ 8004–8014]." Id. ¶ 23. In addition, given that we have directed that Respondent comply with the above directives to cure his zoning violations that have continued on the Property, we intend to provide step increases to the imposed penalties, should Respondent fail and refuse to satisfy these directives.

We look to the specific provisions of 10 V.S.A. § 8010(b) for guidance on the appropriate level of fines and penalties:

Subsection 1: while Respondent's zoning violations are many and long lasting, we did not receive credible evidence concerning actual or even threatened impact to the public health, safety, welfare or environment. Left unattended, we fear that the steep slopes along Respondent's southern boundary may result in erosion and stormwater runoff; that is why we've directed that he re-grade, seed and mulch these areas immediately.

Subsection 2: We received little evidence of mitigating factors that cause us to consider a decrease in the fines that should be imposed. While the Town's enforcement efforts extended over many years, the time expended was largely in an effort to work with Respondent to compel voluntary compliance.

Subsection 3: Respondent expressed sincere beliefs that his activities did not constitute zoning violations. But he ignored multiple demands by two different zoning administrators, over the course of several years. When those administrators responded to Mr. Lee's requests for explanation of the zoning regulations, after having conducted extensive research and consultation with both the DRB and Planning Commission, Mr. Lee continued to rebuff their pleas for compliance. Then, after he was served with the 2013 NOV, Mr. Lee took no further corrective actions. He asked to be commended that he ceased bringing fill on his property without a permit, once he was served with the 2013 NOV. While that decision was commendable, he also chose to take no corrective measures between the time of being served with the 2013 NOV and through the dates of trial.

Subsection 4: Some evidence of another zoning violation by Respondent, on a different Town property, was introduced at trial. While the current collection of zoning violations may represent his first transgressions on this property, we regard his record of compliance as mixed.

Subsection 6:[11] We believe that the best deterrent effect of the penalty imposed here is two-fold: we've imposed a substantial up-front penalty, due to Respondent's repeated and long-standing violations, but we've also given Respondent the opportunity to cut his total penalty nearly in half, should he comply with the curative deadlines imposed above.

Subsection 7: The Town provided credible testimony about the time expended by its Zoning Administrator: over 150 hours of work in responding to Mr. Lee's violations, with an assistant's help totaling 15 to 20 hours. With the Administrator's time costing the Town about $40.00 per hour and his Assistant's help costing the Town $25.00 per hour, the Town provided uncontested evidence of out-of-pocket staff expenses totaling at least $6,500.00. We received no specific evidence of the Town's legal fees and expenses, but given the length of trial, we have no doubt that those expenses were considerable.

Subsection 8: Perhaps the most aggravating factor has been the length of time that Respondent has allowed these multiple zoning violations to continue. He continued to bring fill onto his property even after two Town Zoning Administrators explained that he needed to first apply for and receive the necessary permit. Even with their protestations, he continued to bring

---

[11] 10 V.S.A. §8010(b)(5) has been repealed.

more and more storage trailers onto his property. His violations have persisted for years. For all these reasons, we impose the penalties detailed in the Conclusions section below.

### Conclusion

For all the reasons detailed above, we hereby **AFFIRM** the DRB's decision to uphold all provisions of the 2013 NOV, save for the allegation that Respondent was operating a junk yard on the Subject Property. We further impose the following penalties as a consequence of Mr. Lee's zoning violations:

For the 901 days that ran from after the seven-day cure date from the date of the 2013 NOV (i.e.: Nov. 13, 2013) through the first day of trial (May 3, 2016), we impose a daily cumulative fine for all of Respondent's zoning violations of $15.00 per day, for a total fine to be immediately paid to the Town in the sum of **$13,515.00**. Further, as an incentive for Respondent to comply with the injunctive relief deadlines imposed above, and as a deterrent against ignoring these injunctive mandates, we direct that Respondent pay to the Town an additional **$2,500.00** penalty on each of the following deadlines, if he has failed and refused to fully satisfy the injunctive directives detailed above: **Monday, January 16, 2017**, **Friday, February 17, 2017**, **Monday, May 15, 2017**, and **Friday, July 14, 2017**.

A Judgment Order accompanies this Merits Decision. This completes the current proceedings before this Court.

Electronically signed on November 17, 2016 at Newfane, Vermont, pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Judge
Environmental Division